George Mahalik,            :
           Petitioner      :
           :
           v.                 :
           :
Unemployment Compensation     :
Board of Review,            :   No. 1153 C.D. 2017
           Respondent    :   Submitted: February 16, 2018

BEFORE:    HONORABLE P. KEVIN BROBSON, Judge
                HONORABLE ANNE E. COVEY, Judge
                HONORABLE ELLEN CEISLER, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                    FILED: June 6, 2018

George Mahalik (Claimant), pro se, petitions this Court for review of the Unemployment Compensation (UC) Board of Review's (UCBR) June 16, 2017 order affirming the portion of the Referee's decision denying him UC benefits under Section 402(e) of the UC Law (Law),[1] and reversing the portion of the Referee's decision assessing a non-fault overpayment and, imposing a fault overpayment and penalties. There are two issues before this Court: (1) whether the UCBR erred by concluding that Claimant committed willful misconduct, and (2) whether the UCBR erred by assessing a fault overpayment and imposing penalties. After review, we affirm.

Claimant was employed by Keystone Certifications, Inc. (Employer) from March 2011 until December 27, 2016. Claimant worked as a StarGuard

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(e) (referring to willful misconduct).

engineer,[2] until Employer eliminated Claimant's position for business reasons in November 2016, at which time Claimant accepted a full-time program administrator position. Claimant's program administrator job was similar to Claimant's former position, but required him to work with different products. Although Employer trained Claimant on the new products, Claimant did not put effort into learning the information and performing the job. In a December 19, 2016 meeting with his supervisors (December 19 meeting), Claimant expressed to his manager that he had no interest in learning the new job. On December 27, 2016, Employer terminated Claimant's employment based on his lack of effort, and his statement that he had no desire to perform the program administrator duties. Employer's December 27, 2016 employment termination letter also referenced concerns about Claimant's punctuality and job performance.

On December 29, 2016, Claimant applied for UC benefits. According to the Pennsylvania Department of Labor and Industry's (Department) Claim Record, Claimant reported that his employment separation resulted from a lack of work. Claimant received $1,136.00 in UC benefits for claim weeks ending January 14 and 21, 2017. However, on January 23, 2017, Employer notified the Duquesne UC Service Center (Service Center) that Claimant had been discharged from his position. On January 31, 2017, the Service Center informed Claimant that he was not eligible for UC benefits pursuant to Section 402(e) of the Law. In addition, the Service Center notified Claimant that, due to his knowing failure to inform the Department that he was discharged from his employment, he had received UC benefits to which he was not entitled. It further advised that, because a fault overpayment had been established, Claimant was required to repay the overpayment and was subject to

---

[2] As a StarGuard engineer, Claimant reviewed various products, including imaging equipment and roof products, for the Environmental Protection Agency's Energy Star program.

2

penalties under Section 801 of the Law.[3]  Claimant appealed, and Referee hearings were held on February 27 and March 9, 2017, at which Employer presented the testimony of its President Jonathan Hill (Hill), Employer's StarGuard Program Manager and Quality Assistance Manager Daniel Shiflet (Shiflet), and Employer's Validation Manager Jonathan Martini (Martini).[4]

Hill testified that Employer terminated Claimant's employment because Claimant was not applying himself to learn his new job duties and told his supervisor that he was not interested in doing so.  Hill stated that Employer became concerned with Claimant's work performance during his training.  He explained:

> [W]e have trained other people for this position who became productive after a couple days of training, maybe a week or so.  But after two weeks of training, [Claimant] did not – he wasn't taking notes.  He wasn't becoming able to do the work.  And essentially, it's the same work he was doing before for different product types.

---

[3] 43 P.S. § 871.  The UCBR assessed four penalty weeks pursuant to Section 801(b) of the Law, and a 15% penalty pursuant to Section 801(c) of the Law.  At the time Claimant filed his UC claim, Section 801 of the Law established penalties in such circumstances.  Section 801(b) and (c) of the Law provided:

> (b) Whoever makes a false statement knowing it to be false, or knowingly fails to disclose a material fact to obtain or increase any compensation or other payment under this [Law] . . . may be disqualified in addition to such week or weeks of improper payments for a penalty period of two weeks and for not more than one additional week for each such week of improper payment . . . .

> (c) Whoever makes a false statement knowing it to be false, or knowingly fails to disclose a material fact to obtain or increase compensation or other payment under this act . . . and as a result receives compensation to which he is not entitled shall be liable to pay to the [UC] Fund a sum equal to fifteen per centum (15%) of the amount of the compensation. . . .

43 P.S. § 871(b), (c).  Section 801 of the Law was amended by Section 10 of the Act of November 3, 2016, P.L. 1100, and, *inter alia*, substituted "five weeks" for "two weeks" in subsection (b). However, the amendment did not become effective until May 2, 2017.

[4] The February 28, 2017 Notice of Hearing identified the issues to be considered at the hearing, but did not include the overpayment issue.

Certified Record (C.R.) Item No. 10, Notes of Testimony (N.T.), February 27, 2017, at 8. Hill expounded:

> [A]fter receiving the training that others had received, [Claimant] was given a project or a product to evaluate, which should have took [sic] about four hours to complete. And after four hours, the next day, he was only about 25 percent complete with the project. And, you know, we found him doing other things like being online . . . .

*Id*. at 9. Hill asserted that, when confronted at the December 19 meeting about his lack of progress on the project, Claimant informed Shiflet that he was not interested in learning the new position.

Shiflet testified that Claimant expressed that he did not have interest in working for Employer in his current capacity. Shiflet stated that, as a result, management "had to regroup . . . and make a decision and think about that because ultimately we didn't want to lose [Claimant]. We wanted to develop him, but it just wasn't working." *Id*. at 14.

Martini explained:

> [W]e had provided [Claimant] with . . . a little over 40 hours of training, and he and I had just finished a training on the morning of the 16th for a casement window. . . . [I]t's a very simple form of a window for certification. It took us three hours with training to finish that. . . . In the afternoon, [Claimant] was directed to work on an awning, which is the exact same window just turned on its side. So, he was instructed that . . . with the ample time to do the work, it should take no more than four hours to do this based on [the fact that] it took us collectively three hours to do a very similar one with training involved. So, I allowed him to continue working on it in that afternoon. At 4:45, I touched base[] with him. . . . Now mind you, it was supposed to take four hours to begin with. It's already taken four hours, and only 25 percent was done. I checked with him at the end of the day on Friday, and he was not even . . . 60, 70 percent done with it, so there is 12 hours into it. . . . [I]t wasn't until midday Monday that he e-

4

mailed me back with an incomplete validation and said, I am done with this. I am moving on to some other work now. And that was the point where [Shiflet] and I brought him in at that point. It was actually at 12:40 when we got back from lunch, and he was reading his sermons while listening to the audio and watching [church sermon PowerPoint presentations].

C.R. Item No. 11, N.T., March 9, 2017, at 14. Martini expounded:

We brought him – at 12:40, after we saw that, I [told Shiflet], I'm going to bring him. Let's sit down. [Shiflet] and I both sat down in my office with Claimant and explained to him that – when it is appropriate to do work, when it was not. And we talked about the new position. And both by his actions of dragging his feet on them and taking sixteen hours to not even do something that should have taken four and he verbally admitted to us that he wasn't interested in doing this work even though it was very comparable to what he was doing before, which is reviewing test reports and checking for validity of the reports, which goes hand-in-hand – I think all of us are cross-trained on every aspect of our jobs there. And he looked at [Shiflet] and I and said, I don't want to do this job.

*Id*. at 15. Martini further summarized:

[W]hat prompted the December 19 meeting was that [Claimant] had taken his full lunch period to watch sermons and then additional time after that lunch period leading into 15 minutes after his lunch period to watch sermons and his plan was to eat later in the day and take his lunch even though he'd already taken time to not work during his lunch period.

*Id*. at 33. According to Martini, at approximately 2:30 p.m. after the December 19 meeting, Claimant left his desk with his lunchbox, went to the kitchen, microwaved his food and then went into the bathroom to eat his lunch.

Claimant testified that in his StarGuard engineer position with Employer, he was responsible for reviewing products for the Environmental

5

Protection Agency's Energy Star Program. The products included imaging equipment, set-top boxes and roof products. The new position involved reviewing window types. Claimant admitted he was trained in the new position by an individual named Shawn Shaw, explaining:

> Shawn Shaw did a product pretty much with me shadowing him or watching him. And he explained that. He did a good job. And from there he did – it took several days I think or at least a day and a half. And then, from there, I believe [Martini] and I did a product together or at least partial product together at his desk where again I was overshadowed, [sic] but also – I was shadowing, but also it was interaction. I mean it was training.

*Id*. at 23. Claimant stated that the training occurred over "several days." *Id*. He admitted that "during [training] – when we were performing them, I didn't take many notes because I would miss the next thing we were doing. But as I was doing them myself, after that, I took a lot of notes." *Id*. at 24. Claimant also conceded that he struggled at the new position "understanding how the job should be done – it wasn't clear . . . it was so different than what we had before as far as documentation and how to do it." *Id*.

Claimant denied telling Employer that he was unwilling to learn the new job, and recalled that he told Employer, "I'll do whatever you want." *Id*. at 25. However, when asked if he told Employer that he did not want the new position, he stated, "I might have said I preferred the old position. I don't recall saying I don't want the new position, no." *Id*. Claimant further explained that he "tried very hard at the new position." *Id*. Claimant admitted to watching videos on his computer at his desk during his lunch hour, and claimed it was common for him to eat lunch at his desk. He also acknowledged signing the employee handbook which contained restrictions on using company computers for personal use.

Finally, Claimant testified that he believed that he filed his UC claim online, but he may have spoken to someone as well. He expressed confusion regarding the meaning of the Department's specific language, and his option choice when informing the Department about the reasons for his unemployment.

On March 16, 2017, the Referee affirmed the UC Service Center's determination that Claimant was ineligible for UC benefits. However, the Referee modified the fault overpayment to a non-fault overpayment, and reversed the penalty determination, finding that "[t]he record is void of competent credible evidence establishing that [Claimant] made a false statement knowing it to be false or knowingly failed to disclose a material fact in order to obtain or increase his benefits." C.R. Item No. 12, Referee Decision, March 16, 2017, at 4. Claimant appealed to the UCBR. On June 16, 2017, the UCBR affirmed the Referee's determination that Claimant was ineligible for benefits, but ruled that Claimant had received a fault overpayment and assessed four penalty weeks and a 15% monetary penalty. Claimant appealed to this Court.[5]

Claimant first argues that the UCBR erred in concluding that Claimant had engaged in willful misconduct, because the UCBR's conclusion is based on Employer's witnesses' untruthful testimony and fictitious documents, and because his conduct did not constitute willful misconduct.

This Court has explained:

> In [UC] proceedings, the [UCBR] is the ultimate fact finder and is empowered to resolve conflicts in the evidence and to determine the credibility of witnesses. Findings made by the [UCBR] are conclusive and binding on appeal if the

---

[5] "Our scope of review is limited to determining whether constitutional rights were violated, whether an error of law was committed, or whether the findings of fact were unsupported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704." *Turgeon v. Unemployment Comp. Bd. of Review*, 64 A.3d 729, 731 n.3 (Pa. Cmwlth. 2013).

record, examined as a whole, contains substantial evidence to support the findings.

*Owoc v. Unemployment Comp. Bd. of Review*, 809 A.2d 441, 443 (Pa. Cmwlth. 2002) (citation omitted). "[This] Court may not reweigh the evidence." *Porco v. Unemployment Comp. Bd. of Review*, 828 A.2d 426, 429 (Pa. Cmwlth. 2003).

Claimant contends he was willing to learn his new job, but the new position was very different from his old position. He also asserts that the new position's responsibilities were not clearly defined, that management was ineffective, and that Employer's training was inadequate. Further, Claimant denies that he improperly engaged in personal activities during work time. Notwithstanding, the UCBR, as it is permitted to do, found Employer's witnesses credible and resolved conflicts regarding Claimant's effort, his interest in learning the new job, and his computer use, in Employer's favor. *See* C.R. Item No. 16, UCBR Decision and Order (UCBR Decision) at 3.

Claimant also maintains that although he may have not have performed up to Employer's expectations, he worked to the best of his abilities,[6] and evidence did not establish that Claimant engaged in willful misconduct. Specifically, Claimant contends that "[t]here wasn't evidence that [he] did not engage in training or was unwilling to learn, nor is there evidence that [Employer] had a work rule that required an employee to want to learn a new product." Claimant Br. at 7-8.

"The issue of whether Claimant's conduct constituted willful misconduct under Section 402(e) of the Law is a question of law fully reviewable by this Court." *Johns v. Unemployment Comp. Bd. of Review*, 87 A.3d 1006, 1010 (Pa. Cmwlth. 2014). This Court has explained:

> Although the Law does not define willful misconduct, it has been construed by our Court as: (1) the wanton or willful

---

[6] The UCBR explicitly rejected Claimant's testimony that he worked to the best of his abilities. *See* UCBR Decision at 3.

8

disregard of the employer's interests; (2) the deliberate violation of the employer's rules/directives; (3) the disregard of the standards of behavior which an employer can rightfully expect from an employee; and (4) negligence demonstrating an **intentional disregard** of the employer's interest or the employee's duties and obligations. The employer bears the burden to prove that a discharged employee was guilty of willful misconduct.

We note that mere incompetence, inexperience, or inability to perform a job generally will not support a finding of willful misconduct. However, **it is well-established that an employee's failure to work up to his or her full, proven ability, especially after multiple warnings regarding poor work performance, must be construed as willful misconduct because such conduct demonstrates an intentional disregard of the employer's interest or the employee's obligations and duties.**

*Scott v. Unemployment Comp. Bd. of Review*, 36 A.3d 643, 647-48 (Pa. Cmwlth. 2012) (footnote and citations omitted; emphasis added). Similarly, in *Gardner v. Unemployment Compensation Board of Review*, 454 A.2d 1208 (Pa. Cmwlth. 1983), this Court stated: "Poor work performance reflecting an unwillingness to work to the best of one's ability is indicative of a disregard for the standard of conduct an employer has a right to expect and may rise to the level of willful misconduct." *Id.* at 1209; *see also Geslao v. Unemployment Comp. Bd. of Review*, 519 A.2d 1096 (Pa. Cmwlth. 1987); *Markley v. Unemployment Comp. Bd. of Review*, 407 A.2d 144 (Pa. Cmwlth. 1979).

Employer's witnesses' testimony evidenced Claimant's failure to timely complete his project, his lack of urgency as reflected by his personal video viewing on his work computer, and his expressed disinterest in his new position. Such behavior demonstrated Claimant's unwillingness to work to the best of his abilities and his disregard of Employer's interests when contrasted with his performance in his prior similar position. For these reasons, this Court discerns no error in the UCBR's conclusion that Employer met its burden of proving willful misconduct.

Claimant next asserts that the UCBR erred by assessing a fault overpayment and imposing a penalty, when he did not knowingly make a false statement in his UC benefit application.

Initially, with respect to the repayment of UC benefits received for which a claimant is not entitled, Section 804(a) of the Law provides: "Any person who by reason of his fault has received any sum as compensation under this [Law] to which he was not entitled, shall be liable to repay to the [UC] Fund . . . ." 43 P.S. § 874(a). This Court has explained:

> The word 'fault' within the meaning of Section 804(a) of the Law connotes 'an act to which blame, censure, impropriety, shortcoming or culpability attaches. . . .' *Kelly v. Unemployment Comp*[.] *B*[*d.*] *of Review,* 840 A.2d 469, 473 (Pa. Cmwlth. 2004).[7] Conduct that is designed improperly and intentionally to mislead the unemployment compensation authorities is sufficient to establish a fault overpayment. *Id.* For example, an intentional misstatement on an application for benefits can support a finding of fault. *Matvey v. Unemployment Comp*[.] *B*[*d.*] *of Review, . . .* 531 A.2d 840, 844 ([Pa. Cmwlth.] 1987). **To find fault, the [UCBR] must make some findings with regard to a claimant's state of mind.**

*Chishko v. Unemployment Comp. Bd. of Review*, 934 A.2d 172, 177 (Pa. Cmwlth. 2007) (emphasis added). Further, this Court has held that where a claimant merely makes a mistake, and does not "wantonly disregard[] the truth of the information" or act in a grossly negligent way, such conduct does not support a finding of fault. *Fugh v. Unemployment Comp. Bd. of Review*, 153 A.3d 1169, 1177 (Pa. Cmwlth. 2017). Thus, "[t]he commission of a mere voluntary act does not establish fault. The [UCBR] cannot hold a claimant liable for a fault overpayment for a mere mistake or confusion." *Id.* (citation omitted).

---

[7] *Kelly* was overruled on other grounds by *Crocker v. Unemployment Compensation Board of Review*, 63 A.3d 496 (Pa. Cmwlth. 2013).

Here, the UCBR explicitly found that "[C]laimant intentionally withheld the fact of his termination in order to obtain benefits." UCBR Decision at 2, Finding of Fact No. 10. The UCBR's findings must be based on substantial evidence. *Owoc.* The UCBR explained that finding as follows:

> Contrary to the Referee's decision, the claim record supports the Department's finding that when filing for benefits, [Claimant] reported lack of work. The claim record states: '170109*IVR REASON FOR SEP = LOW CWE 17/01/17.' In addition, at the hearing, [Claimant] admitted that he told the Department that he had been laid off and did not tell it that he had been discharged. Because [Claimant] knew that he had been discharged but intentionally failed to report it to the Department when filing for benefits, the [UCBR] concludes that the overpayment was due to [Claimant's] fault and that the penalties imposed by the Department were appropriate.

UCBR Decision at 3.

The UCBR was entitled to judge Claimant's credibility. *Owoc.* Further, the UCBR's factual findings are based on the record evidence. Accordingly, we discern no error in the UCBR's assessment of a fault overpayment and imposition of penalty.

For all of the above reasons, the UCBR's order is affirmed.

_____
ANNE E. COVEY, Judge

11

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

George Mahalik,                          :
                    Petitioner           :
                                         :
            v.                           :
                                         :
Unemployment Compensation                :
Board of Review,                         :     No. 1153 C.D. 2017
                    Respondent           :

## O R D E R

AND NOW, this 6th day of June, 2018, the Unemployment Compensation Board of Review's June 16, 2017 order is affirmed.

_____
ANNE E. COVEY, Judge